223702 Hunter Doster et al. v. Frank Kendall et al. Arguments not to exceed 25. Mr. Ross for appellate. Thank you again, your honors. Case in Ross for the United States. The district court in granting a class-wide preliminary injunction failed to fulfill its judicial role, compounding the errors flowing from the initial injunction granted to the named plaintiffs. On the merits, the district court never performed the individualized inquiry that RFRA requires, essentially determining that nearly 10,000 service members are entitled to relief under that statute without considering any single one of their circumstances and effectively overruling a number of other courts who reached the contrary conclusion, including the Supreme Court. I mean, we do start from the common foundation of the stay litigation. And you know what the three of us said about that, which is that that's not the claim the court certified, right? So now we can talk kind of directly about this claim of it's a discriminatory policy. It's a de facto categorical ban, or at least a strong bias against requests for religious exemptions. And so the RFRA claim that the court certified, I mean, we agree in the stay opinion that you can't certify the individualized analyses claims, you know, across 10,000 people, obviously. But their claim is the Air Force basically denies all of these, and it's a discriminatory policy. It's like a pattern in practice under Title VII. And it's a class-wide treatment, and class-wide relief is appropriate. So that's how we left things in our last exchange. Sure. I think there's a number of things to unpack there, Your Honor. First, that's not the relief the district court granted, which was individualized accommodations for each service member. And that is what RFRA would otherwise entitle them to, because under RFRA there's no process-based remedy. I don't follow that. I mean, I just recall the district court, the relief, the injunction was, basically you can't fire these folks. I think, I don't want to put words in your mouth, Judge Ketledge, but I think if the district court found that there was a discriminatory policy, and I will say emphatically, there is no such policy. No, you disagree with that. Of course. But if that's what the district court determined, then it would grant some kind of relief akin to requiring a do-over, that the Air Force would need to essentially, as you said, root out the policy and do it again. But that's not what the district court required. Isn't that for permanent? This is just a preliminary injunction. So the preliminary injunction is designed to keep the status quo until the permanent. So I think that if this was a permanent injunction and the outcome was grant the exemptions to everybody, I would agree with you. But the injunction is just the status quo, don't discharge them. Let me consider this, whether this policy or practice exists. At the end of the day, if a policy or practice exists, then the appropriate relief might be the process-based injunction of what you're talking about now. I don't think so, Your Honor. And because the preliminary injunction of the sort you contemplate would also foreclose the Air Force from continuing to implement this otherwise erstwhile discriminatory policy. So there are a lot of service members, I believe something over 3,000, whose religious exemption requests have not been fully adjudicated. And were it the case that the district court were entering some sort of process-based relief, it would have enjoined the Air Force from continuing this charade. The PI maintains the status quo while the courts adjudicate the merits about whether there really is a discriminatory policy. And so, I mean, we wouldn't be mandating, you know, cessation of current, you know, consideration of applications that are pending now or anything. It's just don't, I mean, it's kind of what the Supreme Court said was okay in the Seals case. Don't fire anybody. Don't bust anyone in rank until we get done with this case, and then we'll go from there. So I will just note as a procedural matter, in the Navy Seal case, the government only sought that partial relief. We didn't seek broader relief. Well, that's what the court said was okay. Right, but that is exactly the relief we sought. Nothing further. Well, that's the relief they got here, too. I mean, right? So it's the same relief that the Supreme Court said was okay. Yes. Basically. Yeah, with some refinements after a couple of orders. Right. Yeah. I will just say that that's because the government only sought limited relief from the Supreme Court. We didn't seek a full stay of the district court's injunction there. All right, well. Tomato, tomato, perhaps. But more importantly, RFRA doesn't even afford this kind of process-based remedy. If you or I, for example, objected to the Internal Revenue Service's requirement that we pay taxes for religious reasons, then we could just go to court and sue the IRS saying that our religious beliefs are burdened. And then the IRS would respond in kind, et cetera. But there's no requirement from RFRA itself that IRS have any process at all. So to here, the Air Force, as a matter of good practice and policy, has implemented quite an ornate administrative process to fairly and fully adjudicate each service member's religious exemption request. So what if, imagine, I know this is not this case, but imagine a hypothetical that the government interpreted RFRA, the Sherbert test from RFRA, to simply require a rational basis test. And this was an explicit policy, and it said, we think as long as we have a rational basis, we can mandate this vaccine. And it's the policy we are going to be applying to everybody. As long as we have a rational basis in your circumstances, you have to take the vaccine and RFRA is satisfied. If the plaintiffs ran to court and tried to get a class action injunction against what we would all agree is a misinterpretation of RFRA, it's hard for me to see why that wouldn't be appropriate for class-wide treatment. So I'm just curious if you think it would be, and if it wouldn't be, why isn't the theory that the stay order suggested analogous to that? I think it's because RFRA doesn't require any particular process, Judge Murphy. The government doesn't have to have any administrative review at all. This goes back to what we were arguing in the first argument about how it doesn't really apply to the government until there's a court? Yes. Okay, so if we disagree with that. Respectfully, the Supreme Court said sort of the opposite in Ocentro, where the parties simply sue for an exception in federal court, not before an administrative agency. If you just give me one moment. And that's why RFRA is not a record review statute. A number of district courts have expressly held that the record presented in federal court is different from that which is before an administrative agency. That makes a lot of sense here, too, because plaintiff's commanders have submitted declarations where able, because their claims were fully adjudicated in the Air Force, to explain why their exemption requests were denied. And so it makes a lot of sense that the government would make a showing in federal court, as the statute contemplates, to see whether it can deny an exemption request to a particular policy. And so it's sort of like the Third Circuit's decision in Allen, for example, where the court reversed a class certification of claims challenging accessibility barriers, where the district court certified a quite broad class as violating the Americans with Disabilities Act. But on review, the Third Circuit held that a number of those accessibility barriers don't actually violate the statute and reversed on that basis. Similarly here, the fact of whatever defect the court believes there is in the Air Force's process is no grounds for relief under RFRA itself. And thus a class could not be certified on that basis. That's why the Supreme Court explained in Walmart that a certifiable claim has to be apt to drive the resolution of the litigation and be central to the validity of those claims. So without the underlying predicate of a substantive cause of action that could be certified, class certification is improper. Well, then we have the First Amendment claim. And obviously, you know, leukemia requires neutrality. And their claim as to this discriminatory policy is that it's non-neutral. And if they have significant proof to that effect, then it would seem like under Walmart, they're entitled to the class-wide injunction. So where do you want to go after that? There's a lot to chew on there, Your Honor. I think first is there is absolutely no evidence in the record of any bias against religion. But, I mean, come on. 99-point-whatever percent rejection, and we just close our eyes to that? No, no, Your Honor. Sorry. I was merely responding to what I had assumed your question. In Walmart, the Supreme Court explained that a class might be certified on two separate bases, like a policy of actual bias or a de facto policy of discrimination. So I was attacking the one basis that there is no evidence of bias. And I hope the Court understands that. And the second is that, you know, we do contest that there is significant proof of discrimination here. You know, the statistical evidence plaintiffs have submitted certainly pales in comparison to what was even presented in Walmart. Walmart was just a completely different situation because, as I'm sure you recall, the defendant had dispersed decision-making. And so somehow you had to show that the same animating force was resulting in mistreatment of women in Nevada, Connecticut, Florida, and so on. And the statistics just didn't answer that question. It just didn't speak to whether there was some kind of unifying force. I mean, here it's the military, you know? I mean, it's hierarchical by definition. And I don't read the government to be saying here that individual commanders can, like, freewheel and grant these things. And that sticks. To the contrary, at least one plaintiff's commander granted or thought that the exemption should have been granted. And that person's judgment about the particular circumstances was set aside. So here, I mean, it's a centralized process. It's centralized decision-making, which is just the opposite of Walmart. So I think yes and no. Yes, in the sense that there is a centralized decision-making process and all the appeals are routed to the Air Force Surgeon General. But only if a service member appeals. If he or she chooses not to appeal, the initial denial is the one that sticks. And those are quite dispersed through command levels across the Air Force. Moreover, the medical and administrative exemptions are granted by a whole disparate set of either medical providers or unit commanders in the case of administrative exceptions. So it's actually more similar to Walmart than I think you might think at first glance in that there are quite a number of decision-makers with respect to each of these different... There's one Secretary of the Air Force, and there's one Secretary of Defense. There's one CEO of Walmart. Yeah, but the policy... But it's not a military hierarchical structure. It wasn't in that case. But there's no evidence here that the sort of hierarchy of the military is being dictated by Secretary Austin or Secretary Kendall to say... There's no discovery either. But the policy in Walmart was specifically designed to allow diverse local decision-making. So the employer in Nevada could rely on testing. The employer in Connecticut could rely on more subjective factors. And we wanted diverse hiring practices. I don't take the government to be arguing that two individuals engaged in the same basic functions, one could get the exemption and another could not, even though they're engaged in largely the same tasks, because their immediate supervisor applied very different standards. I would think that the government would have an interest in uniformity of application just for basic, fair treatment across service members. Oh, absolutely, and the government does attempt to treat like alike, as RFRA does require. But I think there's actually an important premise to this entire line of questioning that we've glossed over, which is that these different kinds of exemptions, and we've not had an opportunity to address this, are fundamentally different, that the religious exemptions are granted or denied for very different reasons than the medical exemptions, for example. And contrary to plaintiffs' assertions, there is no blanket policy to grant medical exemptions as a matter of course. Well, it almost seemed to me, in reading your briefs through these appeals, that you make the very distinction. You definitely emphasize this distinction more, between permanent exemption here and the other ones are temporary. And it seems like the government comes close to saying, and we're entitled to deny the permanent ones categorically, or at least have a pretty strong default that we're going to deny them. Am I misreading the government's position? It's almost like you're sort of saying, yeah, we're basically denying almost all these. I mean, the numbers are the numbers. And that's perfectly fine. That's legitimate. We have a good reason, because we just don't do permanent. So far as there are no other permanent exemptions granted. So far as there is, and that would be a neutral law of general applicability, that no service member is entitled to a permanent exemption from being able to be deployed. And that's because, in the Secretary's assessment, both the Secretary of Defense and the Secretary of the Air Force, they maintain a force that is deployable at all times. Why can't you just do, I mean, what Mr. Weiss, you know, he sent us a 28-J, which I'm sure you've seen. And it seems to say, you know, you can enter an exemption, and then if something for real comes up, like, okay, it's not hypothetical, we need you to go somewhere in the world or whatever, then you could revisit that exemption if and when a genuine need arose, as opposed to these sort of, you know, you have to deploy, you know, in two years, and so now we're going to deny it and terminate you, separate you from the Air Force. So I think there's a number of reasons why there's meat on this particular bones here. And that's because, to be fully vaccinated, you need at least a four-week lead time, as you and I may be familiar. Okay. So then it's like, okay, we can see for, okay. Go ahead. But as Lieutenant General Schneider explained, in response to the recent Russian invasion of Ukraine, mobilization was required in 24 to 48 hours, and a number of plaintiffs' commanders submitted declarations saying that they need to be able to deploy on as little as 72 hours' notice. In fact, one of the plaintiffs here services aircraft that are involved in special operations missions, which may be called to action on a moment's notice. And that's the function of the military, that they need to be able to be ready for any eventuality. And so maybe a different example would be helpful for context of the kinds of circumstances in which the permanent religious exemption would be granted. For example, a service member with an overly long beard. That beard could be trimmed like that, and he or she would be ready for deployment. And that is completely unlike vaccination, where service members need to be ready to go at any moment in time. I guess, I mean, this is a little bit stepping out of the line we're on. But, I mean, what exactly, listen, I'm not an anti-vax person. I've had four shots. It didn't stop me from getting a nice case of COVID in August. But, I mean, what exactly is the government's medical premise about how this so undisputedly advances this compelling interest, the very one you're talking about? We need people to be able to deploy. And why is it that somebody who's got natural immunity, whatever that might be, why that person is just so obviously not ready to deploy as the person who got two shots a year and a half ago? You know, I had it in August, or somebody had it in August, and they can't deploy. Oh, no, that can't happen. But somebody who got the shot in February of 2021, they're ready. I mean, is it that you don't get the disease? Because you do. Is it hospitalization? Because why doesn't natural immunity work for that? I mean, I just have to voice that. Of course. I understand, Judge Kethledge. So I think there's two responses that I'll make. First, with respect to natural immunity, there is no FDA-recognized way to measure. There's no serological testing that can actually determine that the FDA recognizes is reliable the level of antibodies in your system that would effectively provide protection against a subsequent infection. Moreover, natural immunity, just like the immunity provided from vaccination, wanes over time, and there is no evidence in this record when any of these plaintiffs were actually, when they actually contracted COVID or the level of symptoms that they suffered, because the antibodies that your body generates vary with the severity of the infection itself. Moreover, vaccination is singularly effective at preventing severe illness and hospitalization. I hope in your recent case, for example, that you only suffered mild symptoms. It wasn't, but... But in any event, the military needs to be able to take as many precautions as it can to mitigate adverse outcomes. That's why, for example, it requires nine other vaccinations, including for tetanus, which is not spread person to person. And, in fact, all of the plaintiffs here would have had to submit to those vaccines to enter the service. And I'm merely articulating that as a rhetorical point, but which only to underscore that it's the military's interest, just as they're going to equip service members with the best body armor that money can buy, that vaccination is essentially akin to that, which is it's the most protective measure to prevent severe illness and hospitalization while these service members are deployed and protecting the national defense. And there's no other means to be able to provide the same level of protection. Is it a two shots and done regimen, or does the Air Force currently require boosters at a certain interval? The Air Force has not instantiated a booster requirement, Your Honor, no. So, I mean, query whether that undermines the idea that... I don't know whether it undermines that reasoning at all. I mean, if somebody got the shot a year and a half ago, there probably aren't a heck of a lot of antibodies left for that either. And yet that person is allowed to deploy and there's no problem with that person. But someone who even like, you know, two months ago or a month ago got COVID, that person is going to get removed from the military unless he or she gets a shot. I mean, I'm just... I know that we can only review this sort of thing so much, but I'm just scratching my head a little bit about the logic of some of that. So I think there is, again, a lot to unpack there. For one, if the extent to which you're concerned or uncertain about a booster requirement, if anything, that requires deferring to the military's evaluation of public health expertise and the availability of the booster itself exemplifies the extent to which the COVID-19 situation is constantly evolving and involves deeply uncertain science that the military is just trying to do its best in light of public health authorities' guidance. And that is the kind of thing that's not the province of the judiciary to question. And... Yeah, no, I mean, to some extent, that's fair. I mean, I'm not so sure if the Air Force is the world's greatest expert in epidemiology, you know, and whether necessarily we defer to them or whether there would be some experts. But anyway, I mean, we're not going to adjudicate that. I just... Just contextually, I was kind of wondering exactly how this advances things in every case. We are also a bit far-field from class certification. Yeah, that's my fault. No, no. Can I ask one? So we talked about RFRA, and then Judge Ketledge asked about the First Amendment. How do you... I kind of find the status quo of the First Amendment in the military context quite confused in how Goldman interacts with Employment Division v. Smith and in the exception for discriminatory laws. Does that impact class certification? You know, the court has told us at the class certification stage we're supposed to look forward to the merits to determine whether there's a common question. And I'm curious if the government has a position on how Goldman applies. So Goldman arguably was a neutral law. If anything, it went from rational basis to nothing at Smith. But if you go... Say the military has what the Supreme Court today would consider not a generally applicable law, would it trigger strict scrutiny under Sherbert, or would it just go back to Goldman's rational basis review? And do we need to decide this or even think about this in determining whether to certify a class for the First Amendment question? You only need to reach the First Amendment question if you disagree with us, or if you agree with us on RFRA. Because the RFRA incorporates what is essentially a strict scrutiny requirement. And so if you agree with us on RFRA, then you would reach the First Amendment question. But your theory on RFRA for class cert is that it's different than the First Amendment because it doesn't have this process-based idea, and the First Amendment might have a process-based idea. And then my question is, well, okay, if we get to the First Amendment, we'll have to start adjudicating the merits of what I view a little unclear law about how all these cases interact with each other. Right. And I'm curious... Yeah, now I understand. Sorry. Well, first, the threshold point that I will make is that we believe the vaccination requirement is a neutral law of general applicability. The fact that there are exemptions granted for other reasons does not defeat the notion that there is a religious exemption process separate from that. And the First, Second, and Ninth Circuits have rejected challenges to vaccination requirements for exactly that reason. The availability of other kinds of exemptions would not necessarily trigger strict scrutiny. And this Supreme Court's decision in Fulton is not to the contrary. There, there was a separate process on how the particular exemption claims were adjudicated that I don't believe bear on the First Amendment question here. So because it is a neutral law, then rational basis would apply. And then you don't get into complicated questions of Goldman's continuing viability in light of... Well, there is... I also find the Supreme Court's case law somewhat unclear on how we determine whether it's a neutral law. I've articulated the idea that it's strict scrutiny to determine whether strict scrutiny applies in some context with Tandon and other of these things. It's like really scrutinizing whether these distinctions hold up, the distinctions between what is allowed and what is not allowed in those cases. And so I'm curious. I wonder if Goldman could somehow apply in a military context to these distinctions as well about whether medical is related, is similarly situated to, or there's a difference between medical and religion. Could we say that we have to scrutinize that? Could we say that Goldman would apply to the scrutiny and so it almost be a rational basis test to determine whether the military has a valid basis for distinguishing between the two? So I do think that we have to engage in some type of scrutiny. How close... Like it's an equal protection type scrutiny. Are these things similarly situated? And even under equal protection, there's rational basis and there's strict scrutiny. But I think determining whether the government has sufficiently articulated a compelling interest and whether the military has effectively refuted the notion that there are less restrictive means of satisfying that interest are questions that Goldman informs on the extent to which you defer to the military's judgments. So even when you're applying that standard of review, it's not exactly the same as strict scrutiny in the civilian context, for example. And it's not just Goldman, but the Supreme Court in winter articulated something similar that although not a RFRA case, the kinds of questions that the courts defer to the military on are exactly those which contemplate expertise-driven judgments, which is exactly what the COVID-19 vaccination requirement is. Any more? Okay, great. You'll have your full rebuttal. We'll hear from the plaintiffs. Your Honors, good afternoon. I wanted to begin with the issue that we raised in our response brief in the 3702 case, which is whether or not this court even has jurisdiction to consider the class certification that Judge McFarland entered. And that rises and falls with the inextricably intertwined analysis that this court engages in. It's been pretty intertwined so far this afternoon. Your Honor, with respect, we disagree with that. And the reason is that the review of the injunction itself undertakes a different analysis and a different standard of review than the class does. And we know that in part because if you look at the government's brief, they separate it out and they're citing cases about class certification versus cases about whether or not the injunction factors were met. For instance... Why wouldn't it just be likelihood of success? If we're going to... I mean, it's a lower standard of review for them. I would concede that. But if there's a likelihood of success that we would decertify the class, then doesn't that satisfy that likelihood of success factor? It's just not a merits question anymore. It's more just whether we're likely to think that the class was improperly certified. And if we think so, then that would take care of the injunction. Your Honor, obviously... No, it's not de novo review of the class certification, which they would have gotten under 23F. But it's just wrapped into the likelihood of success factor for purposes of the injunction. It was a class-wide injunction. And if we find that the class was improperly certified, then there was no basis for the injunction. We think those questions are separate, Your Honor. That the propriety of the class certification is separate and apart from the propriety of whether or not on a class-wide basis, in light of the certification order, Judge McFarland appropriately entered class-wide injunctive relief. But, I mean, to a large extent, both injunctions rely upon the same theory on your part, which is that they have a blanket policy of discrimination. Like, why isn't that enough of a common thread here to make these things intertwined? Because the class issues raise their own legal and factual issues, which actually one of the cases cited by the government in trying to rebut the jurisdictional argument says. That's their Hidden Vallage LLC versus the City of Lakewood case. That case says... I mean, it's not going to be a complete overlap. We don't need complete identity of issues. But, you know, there's some degree of if we decide this thing in this case, it's going to drive the outcome in the other case. And that would seem to be present here. Your Honor, it has to completely dispose of the question. In other words, there has to be a direct alignment. It's not, they're somewhat related. There has to be a direct alignment under this court's precedent to trigger pendent jurisdiction. And so we question that. And I wanted to begin there. We're not conceding jurisdiction. We think there's a serious jurisdictional problem. Turning to standard of review, again, the standard of review on the class is an abuse of discretion. The standard of review on the preliminary injunction is an abuse of discretion. And that's highly deferential. The district court found facts in terms of this at a minimum bias towards denying these exemptions. We would submit that there are no stand-alone exemptions on this record. There hasn't been any discovery in this case, right? Right. You guys didn't ask for Rule 23 discovery, right? We did not. Or you sought certification. And so, like, on what basis is the court finding facts? The court can't find any facts. It can just assume for purposes of a motion to dismiss or for, you know, the motion before, it assumes certain things. But how is it finding things? Your Honor, there was an evidentiary hearing that was held in this case in which we put on testimony. The district court asked the government if it wanted to adduce any hearing or proof. It declined to do so. One of the things that's interesting about the proof of record with the exemptions, that's always been evidence that's been in the control of the government and solely in the control of the government. And one would think if the government, for instance, was going to have proof that it was granting stand-alone exemptions, perhaps we would have seen some of that proof below. And we did not. You are correct, Your Honor. Do you think... So set aside the policy and the basis for the stay order. Just RFRA in the abstract, I think you would concede, requires an individualized analysis. That's the entire point of OSINTRO. So setting aside the policy or practice theory, in the abstract, would you say that RFRA claims are not generally susceptible to class-wide treatment as long as the government is actually engaged in an individualized analysis? I think it would depend on the facts and circumstances. I think the claims here could be for the simple reason that the government is granting robust secular exemptions to the same policy. And so for that reason, especially when you look at the class definition that the court certified below, you've got a class of people who have sincerely held beliefs that have been substantially burdened by the mandate, by definition. And so you've, through that definition, placed the onus on the government to come forward and meet its burden of proof. And I think you could adjudicate them in the abstract on these facts because of the fact that the government is granting blanket exemptions, for instance, to pregnant women. And of record below, for instance, is Major Corby. Major Corby asked for a religious accommodation. The government told her no. Major Corby became pregnant, saw a military doctor. Yep, you're pregnant. Here's your medical exemption. That's a blanket policy. Everybody that's pregnant that asks for an exemption, they grant. So is that the First Amendment claim, though? Or is that, how does RFRA take into account discrimination? So what's the theory for why that type of discrimination would violate RFRA? Your Honor, it goes to the heart of both the compelling governmental interest as well as the issue of least restrictive means. If the government is able to accommodate other people for secular reasons, then obviously they're able to accommodate religious believers for the same reasons. And there are cases that suggest as much in both the First Amendment context. Incidentally, I think this Court's decision in Maryville overlapped the analysis. And there you dealt with a state RFRA, but it's the same standard in Maryville as the federal RFRA. It's still a government requirement to show a compelling governmental interest and least restrictive means. So class certification requires a common question? Correct. Under that view of things, would your view be the common question would be, does the government have a compelling interest in refusing to grant religious exemptions if it grants medical exemptions? And that could be certified on a class-wide basis with a yes or no answer to every class member? We think that is correct, Your Honor. It's absolutely the case. If the government is granting and permitting secular exemptions, it has to grant religious exemptions that are comparable. How would you respond to the government's argument about how RFRA doesn't even care about process and they don't even have to grant any exemptions and that is not subject to class treatment because once you get to court it's going to be an individualized inquiry? So, Your Honor, my reading of 42 U.S.C. 2000BB subsection 1A is clear that it imposes a requirement on the government that it is not permitted to substantially burden religion subject to the exceptions in subsection B. And to adopt the government's theory is to read out parts of a statute, particularly subsection A and B, and to move right to C, the relief section, if there's a violation. With all due respect to the government, I find that position incredible. Under the government's theory, for instance, someone could go out and murder somebody, it's prohibited by statute, no problem with it until you're hauled into court and you're charged with it. But we all know that you can't murder people, it's illegal. You can't substantially burden religion unless you have demonstrated the exception, and that happens before someone goes into court. If it were only a remedy court process, we wouldn't see, for instance, the government's own regulations that require this robust processing, for instance, in a Department of Defense instruction or in an Air Force instruction, all of which reiterate the fact that they can't burden religion unless they establish a compelling governmental interest in least restrictive means. So we look at that argument, Your Honor, and I think it is divorced from the statutory language to begin with. It's divorced from common sense as a second point. Outside this context, have there been other RFRA class actions that you know of, certified? Your Honor, when you say outside of this context, you mean other than other branches of the service? Yeah, just kind of the current litigation that's going on right now? I've been around for 20 years or 30 years, 1993 or whatever, so I can see. I am unfamiliar with whether or not there are any others. Obviously, there are, you know, each of the branches of the service, there are similar claims regarding the Marines. The Navy, obviously, was certified first, and so this is not unprecedented. Other courts are taking these things up. We do believe that there's a process problem. If the government, for instance, was completely ignoring RFRA and just, there was no process at all for exemptions, that would be an issue, and that would, we think there is a systemic class issue. This is right in line with a Title VII claim, for instance, that have been frequently certified. And there's, obviously, religious freedom is protected under Title VII, not as vigorously as it is in RFRA and the First Amendment, but those classes have been certified, Title VII claims, and employment discrimination cases have been certified frequently. I did want to address, if I could, because I think the government has brought it up, the distinguishing aspects between what we have in this case and Walmart versus Duke's because I think that really gets to the heart of the issue. In Walmart, there were 1.5 million class members, thousands of decision makers, all of which were occurring at the individualized level, and the Supreme Court held that the evidence was not sufficient because it rested largely upon a sociologist's testimony where that expert testified he could not determine whether 0.5% or 95% of the decisions were driven by stereotypical thinking. And the statistical evidence was equally insufficient because it was a regression analysis that looked region by region and didn't determine discrimination at the lower level, story level, where it was allegedly occurring. And the Supreme Court noted, I think correctly, that, quote, other than the bare existence of delegated discretion, respondents have identified no specific employment practice, much less one that ties all their 1.5 million claims together. Well, here, Your Honor, we have a 99% denial rate and we have concessions by the government in a different case that the 1% were end-of-service personnel and you just heard another concession today that that, in fact, was the case. I think we heard the one-year window out of government counsel. That is the exact opposite of Duke's. And in Walmart, one of the things that the Supreme Court said was that you would not get common decision-making like that unless there was a decision from the top. Right? And that was the language in Walmart. And yet, here, we have common results coming out of this government process. We have a common practice and policy that's been driving all of this. We have a vigorous thousands of secular exemptions and, comparatively, a very small handful of religious exemptions, all of whom are on the way out of the service anyways. What do you think Walmart means by significant proof of a general policy? It's not clear to me how that would even work. If we say, is it on the merits? Because it's supposed to be different than... Class certification is supposed to be different than merits. And so, is significant proof just enough to survive a Rule 55.6 genuine issue of material fact? Or is it a fact question for the district court that we would review for clear error? I read the opinion and I was quite... If you look at Walmart and you look at footnote 10 of the Walmart case and the Supreme Court's discussion in it, it talks about what that proof needs to look like in a pattern practice case. And it suggests that the pattern practice needs to be established by a preponderance of evidence. And so, that's the... At the certification stage? That... Your Honor, they're citing it in a certification decision and I think that that's a reasonable conclusion. Wouldn't that suggest that you should actually not just grant certification, but grant judgment to the plaintiffs? It would certainly suggest that at the end of the day. Obviously, a preliminary injunction hearing is just that. It's preliminary. It's not binding. Well, it's not. It's a class cert hearing. It's not a preliminary injunction hearing. Right. Right. In a class cert hearing, again, the standard of proof for what is needed in terms of the Rule 23 factors has never been abundantly clear to me about what that needs to be. But here, I think the proof was that it was at least the preponderance of the evidence that established this policy. Here? In this case, Your Honor. So, catalog that for us, the proof itself. Certainly. The proof below was, again, that there were, and I think   in his decision itself. One of the things he cited was the systemic violation of RFRA, the 9062 Religious Accommodation Rule, which is the granting of 86, the denying of 6,343, the granting of 23 on appeal, the granting of, conversely, 729 medical exemptions, 1,006 administrative exemptions. So, I mean, we all know about the disparate rates for the different kinds of exemptions. Right. What else? Anything? Your Honor, in addition, obviously, the concessions below by witnesses like Colonel Pohl, who suggested that, in part, they were reserving the religious exemptions. They were not granting those to afford more medical exemptions. I had a hard time teasing that out between the lines of Colonel Pohl's affidavit or declaration. Your Honor, he suggests, he says, the reason, I mean, I don't know. He says, in part, you know, if we grant these religious exemptions, we're not going to be able to use them for people that have a medical need for them. I mean, he says that in paragraph seven of his declaration. Okay. Take another look at it. I'm not saying you need a preponderance necessarily, but that's a strong statement at this stage of the case. It is, and I'm not sure we need it either. The Supreme Court certainly suggests that that's going to be sufficient. And maybe that's sufficient. Well, we know that that's sufficient at the end of the case, at the end of the proof, that it's more likely than not. Even if that is the standard, I think it's met here. I think the statistics bear it out. In addition, when you look at the evidence, for instance, of the government granting medical exemptions to people like Major Corby at the same time that they're denying religious exemptions to the very same person in the very same circumstance, there's nothing different about her job or the duties that she has. Again, what do you say about the government's distinction, say, in that very example, that one of these exemptions is permanent in the government's view and the other one isn't? We submit that that's simply litigation posturing on the part of the government that's divorced from the actual regulations that suggest that all of these religious exemptions are subject to an ongoing review and frankly withdrawal if circumstances change, which is what the plain language of the Department of Defense instruction says at 1317 subsection B, as well as subsection G and subsection H, as well as that relevant Air Force instruction that talks about circumstances changing and the ability to withdraw them. So that's no different than granting a quote-unquote medical exemption and granting those continuing force for as long as the condition persists. The same is true from the religion. They're just talking about who initiates the withdrawal. In other words, in the medical context, they're subject to renewal as they grow. And the actual critical issue here is whether this is a common question, whether medical and administrative exemptions are analogous to the religious requested exemption. If at the certification stage all you have to say is, yeah, those are common questions that you should win under the first amendment or RFRA. That is true for the certification question, your honor, that those common questions drive, for instance, the question, are these exemptions the same? Did the government actually engage in an individualized analysis? Did the government meet its obligations to  that these exemptions are equally common? And there are several common questions, all of which, by the way, are not just common questions, they have common answers, which is what Wal-Mart fundamentally asks. Obviously, when we get to the question of the class-wide preliminary injunction, there we are looking at did we establish a likelihood of success on those questions. And we believe, again, given the proof here, that we did. The government, I think, would concede that any member of the Air Force that is pregnant and walks in to see the doctor gets an automatic exemption. Any member of the Air Force at the end of the term of service gets an automatic exemption. Any member of the Air Force    term of service gets an automatic exemption. And the government is going to be unable to make that showing given the robust exceptions. I thought it was only about whether rule 23 was  or not. It was an anemic argument, Your Honor, at the end of their brief on the actual preliminary injunction itself. They did go beyond the class certification issues. We believe the record here supports that just as the preliminary injunction was appropriate for the class who were subject to the same discriminatory policy. Your Honor, if there are any other questions, I am happy to accept them on the class questions or the class-wide PI. Thank you for your argument. We will hear rebuttal from the government. Thank you, Your Honor. I'm going to start with Ocentro, move to 23B, which we haven't discussed yet, and then finally move to the equities, which were never addressed by the District Court. First, starting with Ocentro, the Supreme Court left open the possibility of a uniform application of a law so long as the government proceeded with individualized adjudication of particular exemption requests and found that it would be permissible under RFRA. Ocentro foreclosed a categorical rule at the outset if there was no individual adjudication of exceptions, but it left open the possibility that there might be uniform application of a law or policy that admitted no exceptions. And the 11th Circuit held exactly that in Grady in rejecting a Catholic protest group RFRA challenge to a policy prohibiting protests on naval bases. On exactly that reason. And that's similar to longstanding Supreme Court precedent rejecting religious based exemptions to social security taxes and income taxes and the like. And so the same logic, if the Court determines that there is something akin to a blanket policy, which there's not, here, that that would not necessarily be certifiable as a class then, right? Wouldn't the government prefer having a class and having that answer? Because then the answer would bind everybody. Oh, no, I was going to say, the fact that the service members here, roughly 10,000 of them, have heterogeneous interests that this Court in Coleman held would not make a class susceptible to class-wide adjudication. There's something around 150 service members that have sought to opt out or have pursued separate litigation individually. There are cases where, outside of the substantial confusion caused by the district court certification order here, those courts have requested supplemental briefing following oral argument about what to do in those cases. Well, I don't see any conflict between other courts adjudicating what I would call individualized RIFRA claims, claims based on the particular circumstances of those plaintiffs, while another court adjudicates class-wide the question whether some kind of class-wide treatment of religious applicants for religious exemptions is unlawful. It's two different claims. So, respectfully, I continue to disagree whether there are two claims because it is our understanding. No, I understand that. And, of course, that got a First Amendment claim, which obviously would address, I mean, would reach a discriminatory policy. Sure, but I think still the relief for a First Amendment claim would be similar to that which would be provided under the Supreme Court in Colorado River. Not necessarily. Remember what we said in the stay opinion. It's not just, you know, you get permanent exemption. It might be, okay, go back and do it with a nondiscriminatory process. But it's worth saying that the outlines of a permanent injunction, if that ever comes to pass, that's kind of what you're talking about now would bear on. Right. I guess I wanted to emphasize, Your Honor, that there are individuals here who have sought relief on an individualized basis, which would be  case that you're referring to, specifically because those circumstances are usually certified where there's homogenous interests across the class. That's not the case here. Over 100 service members have already sought to opt out because they're otherwise bound by or would be bound  in this case. But they would be bound in the individual. I was concerned about that, too, but there was, what is it, the FDIC case, Cooper versus Federal Reserve Bank of Richmond suggests that for their individual claim, that even if no policy of discrimination exists, I was discriminated against in my own individual case. Now, that was some, I don't know if it was Title 7, it was some type of discrimination claim, but I would think that the  would bind the plaintiff class with respect to the question of whether a policy or practice existed, but it would not bind individual claims for individual RFRA relief or First Amendment relief. So, setting aside whether that's what the District Court certified and whether that's something that RFRA actually provides for, I guess if that's the understanding the Court has of the class certification, that probably wouldn't bind individuals who have sought individualized relief. But so far as that we read the District Court's preliminary injunction, that does conflict with what other service members have sought in other cases. And so... Well, he said over and over again, a blanket policy of discrimination. I mean, that's not talking about individualized analyses. That's, you're rejecting everybody. You're giving categorical treatment that's discriminatory. So, that's what he, he's saying, you know, the class-wide thing. He may have characterized the policy as such. But if you turn to plaintiff's complaint itself and their motion for preliminary injunction, it specifically requests an accommodation, not, it does not challenge the policy and it requests joining the policy or implementation of that policy, but rather that they be effectively given a permanent religious exemption to the  requirement. So, I mean, again, tomato, tomato. Yes, I know, apologies. But I would, I think it is important in my remaining time to address a critical flaw in the district court's granting of a class-wide preliminary injunction, which is wholesale ignoring of the equities. The district court's four-page order never addresses irreparable harm or the balance of equities when here granting relief to something of 10,000 service members is materially different and imposes a substantially greater burden on the Air Force than with respect to 18 individuals. And the district court never even addressed this concern. The Air Force submitted a number of declarations from senior military officials attesting specifically to how there would be greater harms to the military and its ability to respond to global conflicts were class certification granted and a preliminary injunction given against the Air Force. But again, the military, I mean, itself grants a temporary exemption while applicants are having their requests considered, right? That's correct. But in this particular case, there are something of 3,600 service members whose appeals have been finally denied and who would otherwise be assessed for potential discharge from the military, but the Air Force can't do that. And those service members are occupying otherwise deployable billets that the Air Force can't fill with people who would be deployable. And those are serious concerns, even now. Well, I don't follow that, because the injunctive order doesn't tie the Air Force's hands at all in terms of any operational decisions. I don't understand how the court's order would lock somebody into what you're calling a deployable billet or something. Sorry. I think it was that the Air Force, so far as I understand, does not read the preliminary injunction to allow them to remove someone from a position that they're currently in. I mean, the district court's order does allow, so far as we understand. But at minimum, the Supreme Court in Winter emphasized that ignoring senior military officials' testaments of harm and failure to evaluate the balance of responsibility for vacating the preliminary injunction. So we urge the court to vacate the preliminary injunction and reverse the class certification. Unless the court has additional questions. I just see my time is up. All right. We don't have any further questions. Thank you both for your attention and get you a prompt answer.